20-1463 American Clean Power Association Petitioner v. FEDERAL ENERGY REGULATORY COMMISSION Mr. Tzabak for the petitioner, Mr. Kennedy for the respondent, Mr. Jones for the intervener, for the respondent. Good morning, Your Honors. May it please the Court. Gabriel Tzabak on behalf of the petitioner. Your Honors, FERC's post-Ameren orders impose a new rate that was fatally flawed for three reasons requiring remand from this Court. First, FERC clearly risks undue discrimination by vertically integrated transmission owners against competing generators, despite evidence that transmission owners still own generation in the region. FERC failed to meaningfully address this evidence and failed to square its determinations with its own precedent, rendering its orders arbitrary and capricious in violation of the Administrative Procedures Act. Can I ask questions about that first point? Absolutely, Your Honor. What would the discrimination look like? And I have two possible kinds of discrimination in mind, and I wonder if you have one in particular that you mean when you say discrimination. One would be that transmission owners that also own a generator would make a different binary decision on whether to transmission fund or whether to self-fund or whether to have a generator. That's one type of discrimination. They would make that based on whether they own a generator. The other type of discrimination would be, well, we'll run up costs a lot when we transmission, when we self-fund, so long as the generator is owned by somebody else. But, you know, if the generator is owned by us, then, you know, we're going to be kind of conscious of costs and we're going to go with the lowest bidder as long as we can. So are you imagining both of those types of discrimination or just one or a third type? Your Honor, I believe those would be closely linked in practice, but principally the first that the transmission owners would have an incentive or what the Ameren Court referred to as a competitive motive to use transmission owner funding strategically against independent generators where they might not be using it for affiliated generators, potentially driving up costs for those competitors. They would allow the owned generators to fund, but they would not allow independent generators. Yes, Your Honor. Does it matter what form that preference would take, whether it would be – does it matter whether that preference would manifest itself in Version 1 or Version 2 of Judge Walker's question or simply the substantial risk that there would be preference in one form or another, whether they would allow generator funding or would fund it themselves because it's all the same thing if they own the generator funding themselves or generator funding is transmission funding. Your Honor, I think either of the two circumstances that Judge Walker outlined would squarely fit within the Commission's concern with the motive for undue preference and undue discrimination from transmission owners against independent generators, as exemplified in Order 2003, which governs FERC's generator interconnection rules, upheld by this Court in National Association of Regulatory Utility Commissioners v. FERC. Can I ask, from your record evidence, what percentage of transmission owners in MESO own directly or through affiliate generation? Because I heard some, substantial, majority, vast majority. What's the percentage? What's the number? What's the percentage? Your Honor, I'm not certain of the percentage off the top of my head. We're aware – the Amelin Court indicated that only one of the petitioning… Yeah, I'm aware of that. Yeah. But your briefing sure sounded, like I said, it sounded like a majority and vast majority. Significant majority, Your Honor. We're aware of at least 27 transmission owners in the region that still own generation. And how many total transmission owners are there? I'm not certain of that figure off the top of my head, Your Honor. Well, to say substantial majority, you've got to know that 27 is – it's got to be less than 27. A fair point, Your Honor. I don't have the figure of MESO transmission owners off the top of my head, unfortunately. Why was that information not before the Amelin Court? The number of… Yeah, I mean that they concluded there was just one and it wasn't – why was that information not before the previous? Your Honor, the commission made its pre-Amelin findings without respect to whether the transmission owners still own generation. I think that was part of the Amelin Court's basis for vacating the discriminatory treatment portion of the underlying orders from FERC. And because of that, the commission, I don't believe, had that figure in evidence. And the court relied upon the proportion among the petitioning transmission owners. And since the orders that FERC issued on remand has opened, is there any evidence of actual discrimination against independently owned generators? Your Honor, it's impossible to know that because of FERC's practice regarding the agreements. In circumstances where a transmission owner and a generator come to terms on one of the three categories of agreement at issue here, those are filed unexecuted at the commission – or sorry, those are not filed at the commission. They would not generally be available to anyone. Only in the circumstance where the generator and the transmission owner cannot come to terms would they be filed unexecuted at the commission. And we're aware of at least 18 agreements that have been filed unexecuted under protest since the Amelin decision. And at least 21 that have been filed for the retroactive 2015 to 2018 period since the Amelin decision. But the inability to determine the level of discrimination, if any, really speaks to the need to develop a record here, which is something that only the commission can do. On the topic of 21 or 27, of those 27, are you talking about a transmission owner that also owns a generator that is connected to MISO? Or are they just transmission owners that own a generator that's somewhere in the country, maybe not connected to MISO? Your Honor, it's the first circumstance. They own transmission and they own generation within the MISO footprint. These agreements have been filed with the commission because there's disagreement between the generator and transmission owner. Did any of them involve generators that were owned by that transmission owner? Sorry, Your Honor, could you repeat that last part? You said these filings with FERC when there's disagreements between the generator and the transmission owner, coming to agreement for terms for the connection. Did any of those involve a situation where the generator was owned by that transmission? We are unaware of any where the... So these have always been between independent generators and transmission owners, so there have been disagreements. We are unaware of any where they've been filed unexecuted between a transmission owner and its generation-owning affiliate. You're aware that at least some of them have the opposite? Yes, Your Honor, between transmission owners and an independent generator. You think they're all between independent generators? Yes, Your Honor. Unsurprising. Is a rate-making challenge sort of the default method for combating undue discrimination in general? The commission has a range of potential approaches at its disposal. A rate-making challenge would certainly be one of them. And we certainly wouldn't want to presuppose precisely the form that commission action could take on remand here. But our focus is on FERC developing a sufficient record to be able to identify what the risk of undue discrimination is and balance it against any risk to the transmission owners. So the reason I ask is if a rate-making challenge is sort of the normal remedy, the default remedy that FERC makes available in the case of potential undue discrimination, then it might seem that FERC didn't need to explain why it was defaulting to the default in terms of its choice here. On the other hand, if it's not the default, it's somewhat of an unusual remedy, then it might make sense to say, okay, FERC, if you're going to choose to allow rate-making, you're going to say rate-making challenges are the remedy to combat potential undue discrimination, then you have to explain why you're choosing it. Your Honor, you're referring to the commission leaving the door open for individualized Section 206 complaints against undue discrimination here? Yes. That is extremely atypical and inconsistent with the commission's approach to the relationship between transmission owners and independent generators, again, as exemplified in Order 2003. There, the commission's actions really were aimed at preventing the potential exercise of undue discrimination by transmission-owning utilities. That's really where the commission's precedent is, not to say that the commission could not adopt something different, but under the APA, the commission needs to adequately explain why, where it has not used individualized rate-making challenges as a means of remedying undue discrimination in the past, it would be opting to do so here. What precisely did you expect FERC to do on remand after the Ameren decision? So Ameren, on one level, had an economic theory that transmission owners couldn't be forced to operate as nonprofits. And in light of that, Holden, what precisely did you expect the agency to do? Your Honor, that's a good question and one for which I think the most ready answer is the New York Order, which this Court allowed to be lodged from September, which postdates the briefing. In that order, the New York transmission owners filed at FERC to implement a nearly identical transmission-owner funding practice. And I'd refer the Court in particular to paragraphs 33 to 57 of that order, which detail both the transmission owners' evidence that they submitted on what they believe the level of risk to them from these network upgrades was, as well as countervailing evidence that was specifically submitted on these points from generators, from state parties, from other entities on whether they believe that these were realistic risks, and if so, what the scope of them was. Was that not part of the voluminous record before FERC, before the 2015 orders? Is that information not part of that record? The record prior to Ameren did not reflect the scope of any risk in any kind of quantifiable way to transmission owners. There are a lot of assertions in that record that transmission owners faced risk, but with no particularity. Again, I think the New York Order stands as a substantial counterpoint to that and indicative of what the Commission is fully capable of doing upon remit. So is your view that FERC had to create a record that demonstrated that the Ameren Court's economic theory was correct? Simply, the Ameren decision at various points seemed to have no confidence in the level of the Commission's record on the key basis for the remand and vacature, and with instructions for things like holistically assessing the risks and benefits to transmission owners to fully consider arguments. Looked at in its entirety, the Ameren decision simply does not seem to have expressed confidence in FERC's level of record development underlying it, which is why, in our view, the reasonable thing for the Commission to do, with some latitude for precisely how to structure it, would be to accept evidence on those core issues. Your Honor, returning to the second... I was going to ask, do you know, are there other regional transmission organizations that allow transmission funding like this? No, Your Honor. Is this the only one? MISO is the exception. The New York transmission owners, again, sought it, but the Commission denied it. There is a comparable proposal that is still before the Commission from the Mid-Atlantic grid operator, PJM. That has not had final Commission action yet. How would, in this case-by-case approach, if the agreements between transmission owners and their own generators are not getting filed with FERC, because presumably they work out any disagreements amongst themselves, how would discrimination be proved on a case-by-case basis? Your Honor, it would be extremely challenging. From the Ameren decision and from the three orders under review here, it seems that the theory would be that, to Judge Walker's second point from earlier, that if generators believe there were excessive costs included in their network upgrade expenses that they were being billed for, they could file a 206 and contend that the transmission-owning utility was escalating costs. But as to sort of the strategic application of- If they were escalating costs but they were doing it to their own generators, would that be a viable claim? If a transmission owner were escalating costs for their own generators and to the independent generators? Yes, I'm sure they'll say this is what we need to make a sufficient profit. Your Honor, it might be, but we simply can't know. Again, there's simply not evidence here to show whether or not the core point that the Ameren- Would you be able to prove discriminatory treatment? Put aside excess costs. How would you be able to show discriminatory treatment? In a context where only a 206 complaint is available? It would likely have to be under the excessive costs or if there were additional sources, for instance, state regulatory filings that showed differential upgrade costs for affiliated generation. Those would not be before FERC, but it's possible that depending on what state commission rules require, there might be evidence available that would very significantly state-by-state. Do states covered by MISO require such filings? Have you looked to see if this is actually happening? Yeah, there's wide variation in what the level of detail before state commissions might be, Your Honor. But it is certainly not the case that there would be a readily available information in all states in MISO that an independent generator would be able to ascertain if they had been subject to undue discrimination where a transmission or utility had escalated costs to them but not their own affiliated generation. I had one other question, too. Do you dispute that whatever the rule you think FERC should adopt, yes or no, on transmission funding, that the rule should be the same for direct and indirect connections? Do you dispute that aspect of their reasoning? Your Honor, I think that needs to be broken into two parts, prospectively and retroactively. I'm sorry, yeah, I meant prospectively. Prospectively, the commission, if the record demonstrates comparability between the parties who are subject to those three types of agreements, that could be a reasonable approach. Comparability is simply presumed, and the order in which they're determined… Well, how would they not be comparable? Your Honor, they very likely would be, but I think the ultimate determination would have to wait for a commission determination of that. Do you have a theory on how the two situations would be comparable, possibly? I don't have enough experience in this area to be able to understand why there would be any differential treatment. There could be differential treatment based both on aspects like the multi-party facility construction agreement that have multiple funders for them. There could also be differences in the type of facility being funded. For instance, the Emory Court noted that in the region for upgrades above 345 kilovolts, 90 percent is funded by the generator, 10 percent is passed through in transmission rates, and a rate of return is recovered on that 10 percent. So it's possible there could be variation by both agreement type and upgrade type, but again, those are fact-specific matters that we can't know until there's a record on those points. If I could share a theory of the case that you won't like and ask you why it's wrong, I'm going to share a different theory of the case with Perk and ask him that they won't like and ask him. Here's the theory I want you to tell me why it's wrong. We start with what you and Judge Muller were just discussing, that, you know, the indirect and the direct transmission owners had to be treated the same, and that wasn't disturbed by Ameren. And as I see it, that may even be sort of a case closed, a done deal issue. And so then the question becomes, well, is Perk going to level up by allowing both direct and indirect transmission owners to self-fund, or is it going to level down by not allowing either of them to do it? They tried leveling down, and Ameren said that one of the problems with that is enterprise risk. And Ameren didn't leave a lot of room for Perk to later say, well, we don't think enterprise risk is a real risk. I think Ameren made pretty clear that it's real. And so to the extent that you're going to level down, it's because you have to have a different reason that is more important, that outweighs the enterprise risk. And the most logical different reason would be this potential for discrimination. And so then that raises the question, well, is there evidence of discrimination in the record? Seems like there's not evidence in our record of discrimination. Because Ameren said there wasn't evidence in the record, and there hasn't been any more record. And then Ameren said, there could be an economic theory for potential discrimination. We're not going to give a lot of weight to that because there's only one petitioner who owns a generator. But we now know that there are 27 or something. And so then your case against Perk has to depend on saying why. Perk was wrong in that situation to say the remedy for that potential discrimination is individualized rate-making challenges. And Perk said that's the remedy. They didn't give a lot of explanation, but they gave enough explanation. And they do this in other contexts. So it was a reasonable remedy to choose, and it was reasonably explained. So what's wrong with that theory? Your Honor, two points on that. The first is that on the initial part of that theory of the case, you mentioned the comparability determination from Perk. That was in an order that was itself vacated by Ameren. So I think that issue remains open for a future evidentiary demonstration through a commission proceeding. The second point regarding the risk of underdiscrimination, the Ameren court quite clearly left the door open based on the competitive motive that transmission owners still owning generation would have. Petitioner proffered that evidence. The commission notionally accepted it at paragraph 38 of the second of the three orders, the order on briefing and rehearing here. But to call that cursory treatment I think would be generous there. That is the precise animating rationale that this court acknowledged could pose a risk of underdiscrimination. And again, that risk of underdiscrimination, the potential for competitive motive, is precisely what the commission has used to justify, and this court has upheld, in prior rulemakings and proceedings between transmission owners and generation. So at a minimum, the commission needed to better explain why it found that evidence unconvincing and why the remedy that it adopted there, individualized determinations, was consistent or why it had changed its mind from those past determinations, again, upheld by this court. If we were to say exactly that in remand, would that get you pretty much what you want from us in this case? Yes, Your Honor. We would submit that on a remand, the commission would, of course, have some latitude about exactly how to structure it, but we would fully anticipate that they would develop the record in a way comparable to the New York order that's lodged here that holistically looks, as the Ameren court put it, at the risks and benefits to transmission owners, that considers the potential underdiscrimination for independent generators, and considers those things through development of substantial evidence, which is the second of the three points I was going to lay out at the outset. A long time ago. Yes, but development of substantial evidence to fully support ultimate orders here that considers all of these aspects rather than a cursor reversal without further record development, which is what occurred here. Thank you very much. Thank you, Your Honor. I think we have, we'll hear from FERC now. Your Honor, Robert Kennedy on behalf of the commission. Judge Walker, picking up on your question, part A, whether or not the distinction between generator direct connections and interconnection agreements, whether they are similarly situated. In response to that, counsel indicated that the commission's determination was vacated, which it's true. That was initially made in the underlying orders. In footnote 77 of the remand order, the commission noted that reaffirmed its determinations. And I would agree with you. I think the idea that there's a distinction as to how indirectly connected generators should be treated versus directly connected generators is a dumb deal. I agree with you on that. To say I'm pretty sympathetic to the second thing he said in response to my very long-winded question. So if you could address what I think is his strongest point, which is the decision to allow rate-making challenges to be the remedy for potential discrimination was unexplained. Well, I think certainly the commission flagged that. First of all, if I can step back, and I don't mean to sidestep your question, but I will get there. But I think it's important to understand the context in which this took place. The entire case was started by the commission in its sua sponte investigation. So the commission took on for itself the burden of establishing that the existing just and reasonable rate, transmission owner funding, the option for them to unilaterally choose that was unjust and unreasonable. And then the second part, the commission had to establish that a replacement rate was just and reasonable. And the replacement rate is the unilateral selection by the generators as to sell funding. The commission didn't, and that was vacated by the Ameren court. So the question before the commission was, A, based on the entirety of the record, can we, and taking into account the infirmities flagged by the Ameren court, can we make a renewed finding that transmission owner funding is unjust and unreasonable? And if so, then can we go on and establish a just and reasonable replacement rate, the absence of giving the generator the individualized choice, the unilateral choice? In answering part one, could the commission establish that transmission owner funding was unjust and unreasonable? Not that it is just and unreasonable, that it is unjust and unreasonable. A little difference in the burden of proof there. The commission had to make two findings. One, compensation, which I'll come back to, and the second was discrimination, getting back to your question. Again, there was no evidence of actual discrimination in the record. The record has been open since 2005. There has never been any showing. Had there been, the commission obviously would have been interested. It would have bolstered its initial findings. Second, as to an economic theory for discrimination, the Ameren court noted and the commission accepted that there really is no economic theory supporting the potential for discrimination as to those generators, as those transmission owners that are not affiliated with generators. As to the third, the commission accepted their proffer that, and I don't know the numbers, but the orders say a majority of the transmission owners in the Midwest are affiliated with generators. It accepted that, but found that that did not make the existing transmission and accepted that there would be an economic motive for them to discriminate. Again, if this has been in place a while, there was no evidence that it had been used in that manner. So the question before the commission, okay, does that make the existing transmission owner funding option unjust and unreasonable? Obviously, this is all made against the backdrop of the Ameren court's decision that the commission's previous remedy was constitutionally and statutorily on shaky ground, to say the least. But the commission said, okay, we have the normal process for this. When there's disputes regarding interconnection agreements, there's a process that that can be ironed out. Claims of discrimination can be raised in there. You'll see in these orders, the commission said, if transmission owners are treating their affiliates one way in terms of not making them fund or vice versa, treating their affiliates different, making different choices. How are they going to show that? Excuse me? How are they going to show that? Well, so, and my initial point with respect to all your questions about the adequacy of the remedy, the commission flagged it as its remedy, and there was no dispute raised. There was no questions raised as to its adequacy. FERC's the expert here. How are they going? How did FERC, in making this choice, think they were going to show actual discrimination if the agreements between owned or affiliated generators and transmission owners, there's no disagreement. And so they are in favor of FERC. How are they going to show it? So the commission hasn't, in these orders, worked out. It didn't want to prejudge those issues. It said this is a remedy. How can you think this is a remedy if you don't have a conception of how it might work to show discrimination? Well, correct. The way these normally work is a party comes in and says, I'm being overcharged. There's a dispute as to the agreement. You bring a complaint, make a premonition case saying, I'm overcharged. I have some other issue. And then there's a process of discovery involved and all that in which it can be. Does discovery get into whether they're overcharging in other agreements? I think in this context, given what the commission held in these orders, that if there is differing treatment, that would have to be explained by the… No, no, no, no, no. I'm going to back up. You're saying what would happen if they showed differing treatment. I'm asking a pretty good question. They come in… Sorry, go ahead. If you were answering it, go ahead and finish. So I think… There is differing treatment. I'm trying to get to that. The commission flagged in these orders, again, that transmission owners need to treat their affiliates and their…need to have valid reasons if they're going to treat them differently. Why? So I think that is a live issue that could be raised in these complaint proceedings that the commission established. How are they going to… I'm not being clear somehow here. All right. I am an independent generator, and I think this is way too big a bill charging for too much stuff. I file a complaint with FERC. I would like to… I suspect they're not charging their own generators. They own… The same transmission owner isn't charging their own generator that type of extra cost. How do they show that? Well, I'm suggesting that if there is a prima facie case being made in the complaint… Prima facie case of what? That they are being overcharged or treated unfairly… No, no, no, no, no, no. Those are two different things. They are being overcharged. Because they don't know if it's unfair. Right. That they are being overcharged. That there is discovery that takes place in there, and I think given… And discovery of what? Of the cost. You can try and prove that it is being overcharged. So I think… But would that… I'm going to try again. Would that discovery include generator or transmission owner? Did you impose these same costs on generator X, which happens to be affiliated with you? Do you get to look at other agreements as part of that discovery process? And my bottom line answer is I can't answer that definitively. There is a discovery process, and because… Well, if FERC didn't think that they would be able to show… If FERC had known that they would be able to make this showing of differential treatments, how could it possibly have thought this was a remedy? Didn't it need to explain how this would work, how it would address discriminatory treatment? I'm saying the record here does not reflect what would happen in the discovery process. I'm suggesting the commission has identified in here that if there is differing treatment, that is something that needs to be explained so it could be a valid basis for discovery. I don't have any… Maybe one way of answering Judge Maltz's question. What's happened with the 18 or 20 unexecuted contracts that have been filed? So I think what that is… Is there any… What happens in that case? I'm not sure I know the answer to that, where those stand. I think that number captures the number of agreements entered into during the interim period that then the transmission owner came back and said, I would like to take advantage of the opportunity to self-fund these upgrades. So I don't know if there are… I'm unaware of what the status is. So those aren't necessarily contracts in which there's an allegation of discrimination. That's my understanding. I think it's 21. That's what I think that number is, and you see that in the end of the second rehearing order in this case. Out of a universe of roughly 100 agreements entered into while this proceeding was going on, there's about 21 that a change in the funding mechanism was made. But this… As you said, look, this is our usual… We do this all the time. People can always come file complaints on a case-by-case basis without rates charged. They can always do that. This is not a novel process created for this problem. So there must be rules about what this discovery… We have rules on what discovery comes in and what doesn't, and so do non-filed agreements between other generators and that transmission owner. Is that relevant discovery, or is that something that's confidential and isn't going to come in? Well, again, the record in this case does not reflect that, and there have been no… I understand your frustration, and I think it's because… I'm aware the record doesn't reflect that. There have been no allegations of discrimination. The issue has not been litigated, so I'm not sure… What's the standard for discovery? Well, I think it has to be relevant to your allegations. It's not… I apologize. No, my… Judgment Labs hypothetical seems like that information would be relevant. Well, is it relevant if they have to make a… They've made a prima facie case that they've been charged a lot of high costs. They haven't made a prima facie case that it's because of discrimination. Unless we… Do we just infer when there's high cost that it's discriminatory? No, no. No, we don't do that. So they don't… What prima facie case does this person who thinks they've been… This generator thinks they've been charged too much, how do they get even a prima facie case so that it will be relevant for discovery purposes of discrimination? Again, because this issue has not been litigated, I can't answer your question. All right. Good. We can all agree then that FERC did not explain how a prima facie case of discrimination would be made on a case-by-case basis. I agree. The commission identified this as its preferred remedy. Are there other… And there was no issues raised with it that the commission had the opportunity to. Are there other… Are there other situations where FERC has said, we see the structural problem? You said FERC said a majority of transmission owners, also on generation, we know at least 27. That's more than the one that was at issue in Emrin. We see the structural problem. We've recognized that as a structural problem for years and years and years. Is there another situation where they've said, let's solve that case-by-case? Nothing immediately comes to mind, Your Honor. But again, it means that… No, it has been a structural problem before. Well, there's a theoretical problem. That's what the commission acknowledged here. Again, there has been… The original significant orders on this thought it was just theory. Sorry, I missed it. The whole reason that there was all this impetus to try to stop, I think what then Judge Roberts called the bad old days of vertical integration. That wasn't theory. That was a real problem that FERC has been trying to get rid of. Absolutely. For quite some time. That's not theory. That's not economic theory. That is the problem that FERC has been trying to eliminate through orders. And so now you have an order that says, we accept that, I'm told, 27, or FERC's own answer, a majority, a majority of these transmission owners own their own generation. We're taking that as given. And we don't know if that's a problem or not. You come prove it on a case-by-case basis. And you say you're not aware of them ever having done something like that before when they have. In Emory, they didn't have the evidence. And Judge Silberman was quite clear. The court was quite clear in that opinion, and Judge Silberman was quite explicit in oral argument. It would be a totally different case if they had that evidence. And so here FERC has it. But now it seems to be walking away from what it's been doing for years and years and years and years in trying to eliminate vertical integration. So my answer is the Emory Court also made clear that the remedies it initially chose were statutorily and constitutionally infirm. Because there wasn't a discrimination problem. I believe the court said even if there was a theory supporting discrimination, then the commission would still have to answer the second question. Again, remember, it's a two-step process. Is the existing universe unjust and unreasonable? If yes, then okay, what can we do about it? And the court found that there were significant concerns with the commission. What did FERC say here that it couldn't do anything about that discrimination? The only thing it could do was resort to this. Well, I mean, the commission did walk through and retract it and explain why its previous findings as to why. All it did was say what the Emory Court said. Well, it went beyond that, Your Honor. It found one of the points by the Emory Court was that, and again, this sort of goes to both sides of the equation, whether the existing rate is just and reasonable and what a replacement should be, but that the commission had never really grappled with the transmission owner's position, that operation of these network upgrades suggests them to risks, which are not compensated under the current tariff scheme. The court said to the commission, you sort of dodged that issue. Go back, take a look at the record, and address it. And the commission did. It accepted the transmission owner's proffer that operation of these does subject them to a variety of risks that are not compensated under the current tariff scheme. So option C might be let them compensate for those risks in the tariff. Which transmission owner funding does, because then they get to be able to put it in. It does more than that. That's the problem. It said FERC never considered an option C, which would be generator funding, but the tariff has to allow compensation for those risks. I mean, certainly there could be other ways. It didn't consider any other options. Well, because the question before the commission was, based on the record, could it reaffirm its finding that transmission owner funding is the initial hurdle it needs to clear, that it is unjust and unreasonable. And because there were uncompensated risks, the commission found that it was reasonable that generators should. Where did they explain it was those risks were so substantial? Where did it give an explanation as opposed to just state it in a conclusory form? That those risks were so substantial they outweigh this imperative that is sort of driven for, as I've said, years and years and years of policing, being suspicious about, and trying to eliminate vertical integration. Where do they say make that balance? Well, I think as you walk, it clearly does not use the language you just used, but it walks through its findings. Tell me where you think it makes that balance. So I think if you look. Which order, too, are we talking? I'm sorry. We have a lot of orders here, so tell me which order. I guess I'll start with what we call the remand order around page 225 of the JA, paragraphs 38 and 39. Hang on. I'm sorry. I'm in the wrong. We can start there if you like. But I'm sorry, if I could redirect, of course, attention to the remand order, which is actually at one. I'm looking at pages 156 and 157 of the JA. Tell me where they made that balance. So I think if you look at paragraph 31 of the remand order, which is JA 157, you know, the commission finds that there are, based on the record, there are uncompensated risks that transmission owners are subjected to through operation of these network upgrades, and that they shouldn't be. That is essentially in part two of that sentence there. It basically says that it's reasonable that they should be afforded an opportunity to be compensated for those risks. Where does it say this harm is so much that it outbalances what we have long recognized to be a discrimination problem? It's that balance. You're saying they had to balance. There were two things going on here, and I don't see that. Okay, we see there's a problem. Cameron told us there's a problem. Our record doesn't rebut that problem. And that problem outweighs the risk of discrimination. And then I think you go to the remand rehearing order, paragraph 38, where, again, it talks about, you know, here we are. Sorry, I've got to find where it was. That's page 225 of the joint appendix, paragraph 38, which is the remand rehearing order. Again, that's just conclusory, right? If I were describing their decision, I would say they decided that there isn't enough to see. It's not enough to demonstrate there is undue discrimination. Correct. And then it identifies the remedy there. And then on the next page, again, on page paragraph 39, you know, it reiterates the point that there's not enough evidence in the record to overcome the transmission order, showing that they do take on risks when they operate those. It's not making an expert judgment. I'm sorry. It's just describing what Ameren said. Well, and then I believe that ultimately the court remanded for a reason, because it wasn't making the decision and it thought the expert agency here, who is the expert on this risk of undue discrimination, is absolutely the expert and has the ability to see, well, how much, how big is this risk of uncompensated costs? And then balance those two interests, and it didn't do that. I mean, it could. Maybe this question, I'm not here to say what the right answer is. It's to say that in picking this case-by-case so-called solution or remedy, that no one seems to know how it's actually going to work. And FERC didn't grapple with that. Over, you know, as a solution here, as opposed to considering any other options, they're just explaining why we're no longer concerned about majority ownership problem here and its discrimination, which Ameren was very careful to say, we're not dealing with that situation. Correct. But I believe the commission's analysis here is that it could not carry its burden of showing that transmission owner funding is unjust and unreasonable, because, A, there are uncompensated risks there, and, B, yes, there is a potential for discrimination with respect to- Is there a dollar value anywhere on those uncompensated risks? Like what percent? I mean, if they have uncompensated risks and it's, you know, a material percentage in a way that's going to affect their profits, their attractiveness to investors, that's one thing. If at the end of the day it turns out to be, you know, a penny on $1,000, then the balance would be different. Did FERC anywhere sort of see what the magnitude of that uncompensated risk is? I don't believe the record here reflects that. I will sort of take issue with your, you know, point that maybe it's a different question if it's going to throw them into bankruptcy. That's really a- I didn't say throw them into bankruptcy. I said material in a way that would affect their profitability and their attractiveness to investors, which is what Ameren was concerned about. That's sort of a step two question in, you know, would eliminating it be just and reasonable, but here the commission, again, found that the record didn't support the first part of the 206 analysis. You would agree that if there was a problem of under-discrimination and transmission owners came in and said, we weren't able to collect a penny last year. We missed a penny. It would be quite unreasonable for FERC to say, okay, let's not worry about that discrimination. You need your penny, right? I'm sure they're going to say we missed a penny, but what I'm asking is to make this judgment about whether this remedy is the way. It is just and reasonable. This case-by-case remedy for discrimination is just and reasonable because of this other harm. Don't we need to know that harm? Not just the words for it, but like some sense of how material that harm is, how significant it is. Does it really have an impact on profitability or investment? Well, again, I think the statutory context and the standard and sort of what was happening here matters. The existing rate was transmission owner funding. That was the existing just and reasonable rate as a result. FERC is not capable of thinking of anything else. I'm sorry? FERC is not capable of saying transmission owner funding is fine as long as something to protect against discrimination. Or transmission funding is out, but generating funding is fine as long as uncompensated costs, the tariff allows for incorporation of these costs and risks into that. FERC can't do that? Only if it first establishes under Section 206 of the Federal Power Act that the existing rate is unjust and unreasonable. Only then can it get to the second step. And, again, the commission here. So in this two-step process, they could have said unjust and unreasonable because of discrimination concerns. They were not before the court in Ameren, but were specifically reserved and acknowledged that that could change everything. So it's unjust and unreasonable for that reason. But we're not going to go just going with generation funding. That would not be just and reasonable either because of these unincorporated. If they were material in any way, these unaddressed costs. Yeah, I mean, certainly if the commission. So they can't make a, your generator funding tariff has to allow for addressing these costs. They can't do that? If the commission found that the record supported a conclusion that the existing tariff was unjust and unreasonable. Yes, it has sort of broad remedial authority under Step 2 of the analysis. Again, bound by statutory authority. Why did FERC have to decide whether the transmission owner funding was unjust and unreasonable? I mean, what is the commission's view about the intervener's argument that this is a type of situation? Sorry, I lost the end of your question. That this circumstance where you have a remand and the court has vacated all of your orders, including the order to sui sponte consider whether transmission owner funding was just and reasonable. Did the commission have to go back and make any determination? No, again, this started back in 2015 as a transmission owner coming to the commission and saying, if this generator was directly connecting to me, I would have the option to self-fund. And the commission took it and it should be extended everywhere. And then the commission sui sponte considers the question as a whole. So following Ameren, what's the state of play? The state of play is that the commission has changed to the existing status quo, which was transmission owner funding in the generator interconnection agreements, but not in the indirectly connected agreements. That was the status quo. So then if the commission wanted to change that, wanted to take it on, again, I can explain that. Well, they had to do that. They had to deal with the indirect connection issue, the otter tail issue. They couldn't have just sort of said, never mind, we're dismissing our complaint. They had to deal with otter tail's complaint. Correct, correct. But they had to do something. They had to pick one solution or the other because I think at least as a prospective matter, no one's complained. I haven't heard people saying it was unreasonable for FERC to equalize the treatment of direct and indirect connections. And so then they had to pick. This wasn't like we're just dismissing our complaint and going away. They had to deal with this otter tail objection and come up with a solution to it. Correct. When the orders on the commission's – yes, that's what's left. The commission took it on itself to extend transmission owner funding. I'm sorry, to take away transmission owner funding, to change the status quo. When the orders were vacated, the preexisting status quo was transmission owner funding in the direct connections. And, yes, you had otter tail's complaint that that should be equalized. You know, the commission relied on or reaffirmed its previous finding that all those parties, whether directly or indirectly connected, are similarly situated and that the preexisting just and reasonable rate should be extended to those indirectly connected agreements. Any more questions? I know we're – No, no, go ahead. My first question was where is FERC's explanation for why it believes case-by-case challenges were adequate? What's the answer? Well, I think in the remand order, you pointed us – again, I think – I not only read what you pointed us to, but, you know, I wasn't surprised that you named those JA pages. Those are the JA pages that I've got scribbled all over in my notes for our argument. And I think the closest FERC comes, to give you a chance to tell me why I'm wrong, is paragraph 38 on JA 225. In the last sentence there, it says that the WEA – I'm going to skip ahead a bit – does not show why the ability of interconnection customers to challenge costs for the commission is inadequate. Fair enough. Maybe the WEA did not show why that's inadequate. But I think FERC had to show why it was adequate. And where is FERC's explanation for why it was? Well, I think in the Ameren decision itself, the court flagged this as one avenue to – But would you agree that if I read Ameren for the fifth time – I mean, just to short-circuit the – And if I read Ameren and I don't find what you just said, do we remand? The courts – I'm sorry. I said the last – Do you need to remand? No, because I think the – Again, this goes to the first part of the analysis. Did the commission – Was the commission reasonable in concluding that the existing setup was unjust and unreasonable? And there's sort of two bases there, and I think they're independent. One, there's uncompensated risk, and therefore it's reasonable to offer them some degree of compensation. And, again, the idea that the commission has not expounded on how this would work out in practice. It sort of reserved the issue, if you look in these orders, because the same issue came up with respect to how we're going to treat the interim agreements. The commission said it would take a case-by-case – They want to prejudge the issue and would take a case-by-case approach to how we would deal. Great. Thank you, Eric. If there are no further questions, thank you, Your Honors. Do we have an intervener now? If I may, please support Christopher Jones for the interveners. Judge Millett, I'd like to start, if I could, with the case-by-case issue, because there's some – I think there's a fundamental misunderstanding presented by the petitioner's argument. I think the petitioner actually said they can't know if there's been discrimination. That is absolutely not true. This is part – this whole scheme is part of the most transparent regulatory regime that the industry has, frankly, ever seen. And over the 15-year history of transmission-owner optionality, the reason that – you know, there has not been a single allegation of undue discrimination. But the reason they can find out – Do you disagree with this and any other regional transmission organizations? Your Honor, I don't – I think counsel was correct that that's – no, that other RTOs have moved off in different directions. The transmission-owner funding was originally developed by the commission in its pro forma order 2003. It remains in the Mid-Continent just by virtue of the way that the Mid-Continent tariff has developed. Can I try to ask you the – I'm sorry. I just wanted to get to the case because time is short. This discovery issue that we were talking about, that which I confess profound ignorance about how it works, so if a generator comes in and says, I think I've been overcharged in a way that makes the rates unjust and unreasonable. And does that allow them to get discovery of the agreements not filed with FERC between that same transmission-owner and a generator that – generation that it owns? Absolutely, Your Honor. These contracts are not – these are not secret contracts. The only reason – I want to be clear about this. The only reason that those – the contracts that are agreed upon are not filed with the commission is only because they use a pro forma form and the commission for workload purposes says, if you use the form contract, I don't need to see it. That's the only reason those contracts are not filed with the commission. In fact, now I can't say this for – Where would I find – where would I find – So there's two places. And again, I can't say for – I haven't checked in recent weeks, but at one point every contract was actually available on the MISO website. Again, McContenant itself is a party to these contracts. They signed them. The second place is – And those form contracts, will they detail the charges? Because my assumption is that the independent generator doesn't have a form contract. Will they charge more? Will it detail – would it allow you to document whether owned generation and this independent generation are charged the same thing? Can you tell that by looking at the picture? As to the funding election, that has to be memorialized in the agreement. It's apparent on the face of the agreement. All these costs. Well, the costs, indeed, yes. The upgrade costs are absolutely in there as well.  Every piece of evidence they would need to know to know whether they were treated exactly the same as a transmission-owned generation. Every detail of that contract, every number, is going to be there on MISO's website just like theirs. Again, at one time they were on the MISO website. Again, the second – I don't know if they still are. I don't run the MISO website. The second place, though, Your Honor, is the commission, in lieu of requiring them to be filed, asks for this thing called an electronic quarterly report, at which point every contract is listed and the parties there, too. Again, where we – Again, listing contracts and parties isn't the same thing as the details in a way that would let me know if I was treated differently or the same. I don't believe the petitioners have ever asked. And I would be – That's not my question. Well, I understand. The information – I at least – if you're going to have a case-by-case approach, it's got to be – allow them to show discrimination. And it wasn't clear to me that this discovery process would allow that. And, again, I would suggest that it doesn't even need to get to a formalized discovery process. Again, with an independent entity running the transmission system and signing these agreements, our funding elections are not secrets. That is just not true, that they cannot know. And, again, I think the only reason there hasn't been record developed there is because I don't – When you say funding election, you mean transmission funding versus generation funding? Yes, Your Honor. No, but that's not – the point is the details of it, like what they're charged. As to – is your question, Your Honor, can we specifically charge them more for the same widget? That, yes, or a higher rate of return, or – I mean, there's a lot of ways and a lot of numbers that a transmission owner could, you know, up things for – I'm not saying this is happening, to be clear. This is all hypothetical. To be clear, and let me unpack this in the order in which you present it, but in backwards, actually. The rate of return absolutely cannot be changed. That's regulated by the commission. It's in the tariff. We have no ability to change that or charge different rates of return at different costs. It would not be allowed. That's the file rate doctrine would prohibit it. As to other costs in the agreement, those are costs flowed through on an actual cost basis, detailed in the agreement itself. So a typical generator interconnection agreement will say $10 million for a new substation, $5 million for a reconductor of this line, and $5 million for some other labor associated with doing the project. Again, the reason – and you're right. At some point, this entire regulatory regime was grown out of a suspicion of vertical integration. I would grant you that. But what we have in its place is an independent entity and a pro forma contract that makes these details available. Again, I don't – Too bad FERC didn't say what you've been saying. Your Honor, I think maybe the reason they didn't is because, frankly, it's so ingrained in the regulatory regime that this is the transparency of it and that these contracts are not state secrets. In fact, we would absolutely – we would expect to own our cost estimates and expect to own our funding elections at every turn. Well, if it's all so transparent, then why would there even be a need for this case-by-case? Well, again, if it's – If it's all set, if the rates return, if all these charges are out there, they can't be changed between different generators. They can't be changed between different generators. But what Petitioner is worried about is the funding election, and we do have that optionality.  I think they're worried about what's going to happen with the funding election. I'm sorry, Your Honor, I missed the question. I think they're worried – you're not worried just so you pick transmission funding in the abstract. It's what transmission funding allows to have happen. That's what they seem to be worried about. It is, and it would allow us to earn that regulated rate of return, which we cannot change. That rate is in the tariff. Mr. Jones, is part of your argument that because there is so much transparency, there is, in fact, not a lot of discrimination because everyone can kind of see what is happening in these contracts? I mean, do you think the transparency in part eliminates the possibility of discrimination or eliminates the actual – any possibility of actual discrimination? Your Honor, I don't know that I would go so far as to say that mere transparency would per se eliminate all possibilities. But it would absolutely bring – Do you think it's discouraging that? Absolutely. I mean, again, vertically integrated utilities operate under a comprehensive scheme of regulation to ensure exactly that, that the transmission system cannot be used to provide preferential access to an affiliate or a cell phone generator or transmission system. That's the entire regulatory regime that's been in place now since 1990. So when we say – Your decision in Ameren said the reason – it wouldn't – reasoned that – sorry, reasoned that the reason that there would not be discrimination risk is that there is only evidence in one, and then specifically went on to say because this has all been getting – this vertical integration has all been getting driven out by FERC and its orders. We did not say anything about it won't happen because of transparency. Well, I – It can't happen or it will be such a minuscule risk. And this is all the balancing that normally I would have thought FERC would do. They would say because of this transparency, because of this, because of that, maybe it could happen, but it's hard. Even if you have 27 of these folks owning their own generators, it's just really hard to discriminate these days because of other protections we've put in place. And the costs and risks that are not being compensated are high enough to make this, you know, that balance. That's what – we need to worry more about that than we do about discrimination. But I just don't see that anywhere in FERC's decision. Well, I think the Ameren court's discussion of vertical integration went to motive. And what the commission did on remand said we looked and we, again, see no record of a single allegation over a 15-year history of transmission owner optionality in funding that this has ever happened. Well, that's because there were – for a while there, there was a third option that was being used, first of all. That's right. I don't have an appeal record. Yes. But again, the question here is FERC needed to explain why with these two concerns. And when Ameren was on a record that didn't have really a plausible discrimination concern, and then they say we accept the association's evidence that, in fact, there are funding for a majority of integrated – vertically integrated transmission owners. We're accepting that now. So now we have a problem that we didn't have in action. And then said we accept that there's uncompensated costs and risks, or maybe it just ended up being uncompensated risks, but it didn't quantify those. And it never did this balancing, which to the expert, it could get this information and inspect the balances. It seems reasonable. But I think the reasonableness of FERC's reaction in that situation, Your Honor, goes from the fact that this rate has been in place, like I said, for 15 years. And the commission has known that there has been – no generator has ever stepped forth and said, I am being treated unfairly as to the funding election. Or there may have been cost disputes, but those can be handled. I don't know that there was ever a discrimination cost dispute. But again, the commission, I think, was absolutely reasonable to say, you know, the court told us we overstated the risk of discrimination. We understated the risk to the transmission owners. And we look back on the record and we think that the court had it right that we got that balance wrong. Thank you very much. All right, we'll give – Stewart Tabak will give you two minutes. If you can start by responding to this argument about can't have discrimination with all the transparency that's out there. What are you guys really worried about? Thank you, Your Honor. On that point regarding the potential for discrimination and transparency, we know that the core issue here is that the – while MISO is an independent administrator of these contracts, the election is unilaterally done. The election of which funding structure to use is done by the transmission owning utility at their sole discretion. MISO can reflect that. MISO will collect the associated rate. But that is not with – that is not the decision of the independent grid operator. The decision – go ahead. Back to your first question. That was two before. So why did FERC believe there would be discrimination once you also allow self-funding by indirect? Your Honor, two responses there. First, the Otter Tail complaint dealt with one category of the affected transmission owners, the facility construction agreements. It did not deal with the multi-party facility construction agreements, which is a separate category, and that sort of leads to the retroactivity to 2015 for that category that wasn't on notice. I think I'm asking a different question. Yeah, I think so, Your Honor. Before whatever year it was filed, 2000 – what year was Otter Tail? 2015. 2015. Before 2015, direct transmission owners could elect to self-fund. And they – there's no evidence that they were discriminated. Maybe it's because of this transparency incentive to not discriminate. Who knows why? They weren't discriminating before 2015. And so now that we add a new group that can also do what direct transmission owners were doing, why would we think that all of a sudden – why would we think the indirect transmission owners are going to discriminate when the direct transmission owners never discriminate? Your Honor, I would simply say that that factor, if it was animating FERC's decision-making, is not reflected there. It did not – And I'm pretty – I think I agree with you. And that might – but are we – okay. But what's your answer to the question? Your Honor, our response there is that the structural motive that the Ameren Court noted is still present. And the Commission's response to structural motives has been to structure prophylactic rules that prevent the potential exercise of underdiscrimination by transmission-owning affiliates. Again, if the Commission changes its mind, it needs to adequately explain why the new remedy it's proposing is sufficient. Mr. Tabak, you've also asked us not just to remand for further reasons but also to vacate FERC's decision. And what will happen to all the contracts that have been entered into in the interim? Your Honor, for the contracts that have been filed unexecuted, I would imagine that the Commission will have to revisit those. Those, I believe, are treated as open proceedings at the Commission. And there may be an opportunity to move away from the funding election. For the contracts for which the parties reached agreement and they were not filed unexecuted, my suspicion is that those would not be reopened because the parties had a meeting of the minds. But ultimately, there needed to be some remedial effect here because all of FERC's actions were immediately timely sought re-hearing and timely appealed. If there's constructive notice back to that date, then FERC may be in a position, depending on what the record reflects, of having to consider retroactive application back to 2018 or back to the interim period. Do you agree with the predicate of Judge Walker's question that there was no discrimination by direct transmission owners that directly owned their own generation prior to 2015? I would agree that the Commission did not deal with any complaint on that front. And my understanding is that transmission owner funding was little used prior to that period. Okay, so it wasn't used often, so we don't really know that. So there wasn't sort of a statistically significant sample before 2015, is that your answer? I think that's accurate, Your Honor. And now it would be pretty universally used within MISO, is that the point? Our understanding is it has become prevalent in the region. The indicative precedent here is what I would believe led to the New York transmission owners filing for comparable treatment here in the September order that's lodged with the court. It's such a great gig that everybody's doing it now. Why weren't they doing it with direct transmission? Your Honor, I can't speak to the decision-making process at that time. There could be various factors that play in here, including the type and value of the network upgrades that might be at issue, which, again, speaks to the need for record development here to establish both what the risk of underdiscrimination might be and what the risk, if any, to the transmission owners is, and to holistically assess those risks and benefits simultaneously and arrived at a reasoned conclusion that balances them. If we remand and FERC comes to the same conclusion in their explanation, everything Mr. Jones said, that would be reasonable. Your Honor, if FERC does the type of record development that it did in New York and adequately explains itself, I think that would be a very different case from the one before the court today. I can't presuppose any action from independent generators at that stage, but it would look like a fundamentally different case from the one the court's considering now. Thank you very much. Thank you, Your Honor.
judges: Millett, Rao, Walker